St. Louis, Iron Mountain & Southern Railway Company

*v.* Goss.

Opinion delivered November 29, 1909.

1. Pleading—amendment.—In an action against a railroad company for negligently killing a mare, where the complaint alleged that defendant negligently struck and killed a mare, and negligently chased said mare for a long distance and on to an open span to a bridge," etc., it was not error to permit plaintiff to amend, after the evidence was in, by alleging that the defendant "negligently ran said mare into said bridge, where she was injured, and from which injuries she died." (Page 377.)

2. Railroads—stock killing—negligence.—Where, in an action against a railroad company for negligently chasing a horse into a bridge and causing death, the testimony tended to show that if the trainmen had been keeping a proper lookout they would have discovered the animal sooner than they did, and that no stock alarm was sounded, the question of negligence was properly submitted to the jury. (Page 378.)

Appeal from Boone Circuit Court; *Brice B. Hudgins,* Judge; affirmed.

STATEMENT BY THE COURT.

The appellee alleged in his original complaint that the defendant company on the 11th day of July, 1908, by its freight train known as "Red Ball" No. 253, at or near mile post No. 64 in said county, negligently struck and killed a mare, and negligently chased said mare for a long distance, and on to an open span to a bridge, where her feet went through, and she lay helpless on the track in front of said train; and that said company and its agents stopped said train and wantonly rolled said mare off the track and killed her; that said mare was the property of the plaintiff, and valued at $175.

After the evidence was in and the prayers for instructions presented, the court permitted appellee to amend his complaint by adding thereto the allegation that the defendant company "negligently ran said mare into said bridge, where she was injured, and from which injuries she died." Appellant excepted to this ruling. All material allegations were denied.

The evidence of appellee's witnesses tended to show that they observed appellant's train stop at a water tank about one fourth of a mile from the depot at Myrtle, Arkansas; that as the train came on from the water tank, and as it neared the depot, they saw appellee's mare, mule colt and filly running by the side of the track about forty or fifty yards in front of the train; that the train did not slow up, nor did the whistle blow; only a few clangs of the bell were sounded, and they kept going. In a little while they heard the train stop, then there were three short blasts of the whistle, and the train moved a little, and all was still. Witnesses went down to the train, and found it standing about one hundred feet from the bridge over Bear Creek. They could see the train men at work on the bridge. One of the witnesses started out to where the train men were at work, and the latter requested that the witness go back. The witness did so, and the colt came off the end of the bridge. The mare was found dead, next morning under the second span of the bridge. One of the witnesses stated that: "Shortly after leaving the depot, there is a thirty-seven foot fill, about 200

yards long, then a side cut 100 yards long, then a big cut twenty-seven feet deep, about 200 yards long; then at the south end of this big cut there is another fill of twenty feet, 100 yards long; then another little side cut, that being sixty feet from the approach to the bridge."

Appellee testified as follows: "That he was the owner of the mare; that he went to the bridge over Bear Creek on the morning after she was killed, and found her lying on the edge of the creek bed under the bridge; that she was torn in the stomach, and head was caved in, and there was a cut place on her thigh that looked like she might have been struck by the pilot of the engine; that she was the only one of the three animals that had shoes on, and that he traced where she had run on the right of way by her tracks; that she had run along by the side of the rails for some 200 yards from the place that she got on the track at the crossing at Myrtle, and then got in the middle of the track, and ran all the rest of the way of the one-half mile down between the two rails; that the mare was six years old, was an extra good brood mare and a good working animal, and worth $150; that he examined her limbs, and none of the bones in her legs were broken.

The witnesses for appellant testified as follows; O. A. Adkins: "That he was the engineer in charge of the train No. 253, known as the "Red Ball", going south, on June 11, 1908; that he had taken water at the tank, and was pulling out; that he had passed the depot when he saw three animals on the track; that he sounded the stock alarm, blowing five or six short, sharp blasts of the whistle, and the stock ran down the track; that he shut off the steam and put on the air, and had his train under complete control, running at about four or five miles per hour; that he first saw the stock between the depot and the cut, which is about 300 yards from the depot; that he kept close enough to the stock to keep them in the light of the headlight, so that he could see what became of them; that he did not blow the stock alarm any more for fear that he would scare them worse and increase their peril; that there are several places before they get to the bridge where they could have gotten off the track, and that the filly did get off before they went into the last cut; that when he discovered they had run into the open

part of the bridge he stopped about twenty feet from the approach of the bridge and backed the train about eighty feet, and that he, the fireman and brakeman went out on the bridge; that they got the colt off, but that the mare was down in between the ties floundering around, and they did not touch her, and she finally fell off the side of the bridge; that he could stop the train in forty feet; that there is 300 feet of the approach to the bridge that is graveled so that stock can walk on it; that he did everything he could to prevent the mare being injured; that the train did not strike her; neither did the crew throw her off the bridge; that the train kept about 200 feet behind the stock."

W. F. Harris testified: "That he was a fireman on the train, and when he first saw the stock on the track they were in the cut, and the train was past the depot going south; that the brakeman, who was sitting on witness' seat, saw them first, and called his attention to it; that he looked and saw them, and that about that time the engineer also saw them; that there was no stock alarm, but the ringing of the bell for the crossing, which was still going on for the crossing; that one of them got off the track before the train got to the big cut, and that there was a place where the others could have gotten off, and they went through the cut before they got to the bridge; that they got the colt off in safety, but the mare was down in between the ties floundering around on the bridge, and it was too dangerous to go to her, and for that reason none of them touched her, and finally she fell off; the train did not strike her, neither was she thrown off the bridge by the crew.

Frank Marshall testified: "That he was brakeman on the train, and was sitting on the fireman's seat; that he first saw the stock between the depot and the cut, and called the attention of the fireman and engineer to it; that the engineer had the train under control, and slowed the train down, and entirely stopped when they got to the bridge; that the engineer did not sound the stock alarm; that the only one time he sounded the whistle was back at the station for a private crossing; that they were running four or five miles per hour; that he is familiar with the track at this place, and in fact helped to make it; that there were several places where the stock could get off, and that the filly did get off before they got to the last cut; that after going

through this cut there was a place and the last place where they could get off; that it is about five car lengths or 180 feet from the end of this cut to the beginning of the bridge, that is, the approach of the bridge, and that this is ballasted up so that it could be walked on. But there is a fill some eight or ten feet high before you reach the approach to the bridge, and that it is after you leave the cut and before you reach this fill, that the horses could have gotten off; that the train was running about 100 feet behind the stock; that the train did not strike the stock, neither did the train crew throw the mare off the bridge."

At the request of appellee the court instructed the jury as follows:

"1. If you find from a preponderance of the testimony in this case that the mare belonged to the plaintiff and was negli-gently struck by defendant's train and killed, or if you find that the mare was negligently run upon the bridge of defendant by its train, and thereby received injuries from which she died, you will find for the plaintiff, and assess his damages in any sum that you may find from the evidence in this case, not to exceed $175.

"2. I charge you that if plaintiff's mare was run into the bridge by a train of defendant's and injured, and died from the injuries received, the law presumes negligence on the part of the defendant, and you will find for the plaintiff, unless you further find from a preponderance of the testimony that defendant and its employees were free from negligence.

"3. If you find for plaintiff, the measure of damages will be the value of the mare at the time and place of its death, with six per cent. per annum from that time."

Exceptions to the ruling of the court in giving the above were duly saved.

The court refused to grant the following prayer of appellant's:

"1. You are instructed that, before you would be authorized to find for plaintiff, you must find from a preponderance of the evidence that the plaintiff's mare, described in his complaint, was killed either by being struck with the defendant's engine, or that she was killed by being rolled or thrown off a bridge or trestle,

a part of the defendant's railroad, by the employees of the defendant."

"2. You are instructed to find for the defendant."

Appellant duly excepted. The verdict was for $135. Judgment was entered for that sum, and this appeal was taken.

*Kinsworthy & Rhoton, Horton & South,* and *Jas. H. Stevenson,* for appellant.

The evidence does not support the verdict. 66 Ark. 248; 36 Ark. 611. It is not the duty of trainmen to stop and drive animals away. 37 Ark. 593; 69 Ark. 619. The *prima facie* presumption of negligence was overcome by the testimony, and the verdict should have been set aside, 67 Ark. 514; 78 Ark. 234; 80 Ark. 396.

*J. M. Shinn* and *Pace & Pace,* for appellee.

It is the duty of the engineer to endeavor to drive stock off the track by sounding the alarm, and to stop the train if there be reason to suppose there is danger. 37 Ark. 592; 69 Ark. 619. The trainmen's testimony did not overcome the statutory presumption. 68 Ark. 32; 75 Ark. 61. Pleadings may be amended by inserting allegations material to the case. 58 Ark. 13; *Id.* 612; 68 Ark. 314; 67 Ark. 426; *Id.* 142; 75 Ark. 181.

Wood, J. (after stating the facts). The court did not abuse its discretion in permitting the amendment. The original complaint alleged that appellant "negligently struck and killed a mare, and *negligently chased said mare for a long distance* and on to an open span to a bridge," etc. The amendment was substantially a repetition of the above allegation. It did not change the cause of action.

There was evidence to warrant the conclusion that the mare was "negligently run into the bridge." It appears that the animal ran two hundred yards by the side of the rails, from the place where she first got on the track, and then for a half mile between the rails before she was killed. The testimony of witnesses for appellee tended to show that the fireman and engineer could have seen the animal running beside the track before they did see her if they had been keeping the "lookout" required by the statute. For the mare was running forty or fifty yards ahead of the train before it reached and passed the depot. "As it

neared the depot," the witness saw the animal running beside the track forty or fifty yards in front of the train, yet the testimony of the engineer and fireman shows that they did not see the animal until they had passed the depot. It was a question for the jury under the evidence to say whether or not appellant, through its engineer and fireman, was negligent in failing to keep the proper lookout. It was also a question for the jury as to whether or not appellant was negligent in failing to sound the stock alarm, and in failing to lessen the speed of its train, or even stopping same before running the animal on to the open bridge. While the engineer testified that he had shut off the steam and put on the air and had his train under complete control, there is enough contradiction between his testimony and the testimony of the other witnesses for appellant to make it a question for the jury to say whether the engineer had done "everything he could," as he says, "to prevent the mare from being injured." The engineer says he "sounded the stock alarm, blowing five or six short blasts of the whistle." But the fireman and brakeman both testify there was no stock alarm, but only the ringing of the bell. It was a plain case for submission to a jury. *Little Rock & Ft. S. Ry. Co.* v. *Trotter,* 37 Ark. 593; *St. Louis S. W. Ry. Co.* v. *Costello,* 68 Ark. 32; *Arkansas & La. Ry. Co.* v. *Sanders,* 69 Ark. 619; *St. Louis & S. F. Rd. Co.* v. *Satterfield,* 75 Ark. 61.

Affirmed.